IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

CONNIE L. RHINEBOLT,

    Plaintiff,

v.                                                Civil Action 2:17-cv-369
                                                Judge James L. Graham
                                                Magistrate Judge Jolson

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Connie L. Rhinebolt, filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying her Title XVI Supplemental Security Income Disability application. For the reasons that follow, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 11) be **OVERRULED**, and that judgment be entered in favor of Defendant.

**I. BACKGROUND**

    **A. Prior Proceedings**

Plaintiff filed applications for Title II child's insurance benefits and Title XVI supplemental security income ("SSI") on September 6, 2011, and August 24, 2011, respectively, alleging disability since November 1, 2006. (*See* Doc. 9-3, Tr. 157, 169, PAGEID #: 230, 242). Her applications were denied initially, after reconsideration, and by an Administrative Law Judge. (*Id.*, Tr. 210, PAGEID #: 283). By order dated March 12, 2015, the Appeals Council remanded the case for further proceedings. (*Id.*, Tr. 234, PAGEID #: 307).

Following the remand, Administrative Law Judge Paul Yerian (the "ALJ") convened a supplemental hearing on July 30, 2015, but continued that hearing until updated cardiology

records could be provided. (Doc. 9-2, Tr. 96, PAGEID #: 168). A second supplemental hearing was held on June 17, 2016 (*id.*, Tr. 55, PAGEID #: 127), at which time Plaintiff amended her alleged onset date to June 22, 2011, thereby withdrawing her Title II claim for child's insurance benefits. (*See id.*, Tr. 60–61, PAGEID#: 132–33). On September 26, 2016, the ALJ issued an unfavorable decision. (*Id.*, Tr. 20, PAGEID #: 92). Plaintiff again requested review of the administrative decision to the Appeals Council (*id.*, Tr. 16, PAGEID #: 88), which denied her request on March 7, 2017 (*id.*, Tr. 1, PAGEID #: 73).

Plaintiff filed this case on May 1, 2017 (Doc. 1-1), and the Commissioner filed the administrative record on July 7, 2017 (Doc. 9). Plaintiff filed a Statement of Specific Errors (Doc. 11), the Commissioner responded, (Doc. 12), and Plaintiff filed a Reply (Doc. 13).

### B. Relevant Medical Background

On August 3, 2010, Plaintiff saw cardiologist Dr. Ken W. Lee for evaluation of "recurrent syncope, frequent atrial premature complexes and some runs of supraventricular tachycardia[.]" (*Id.*, Tr. 734, PAGEID #: 811). Plaintiff reported to Dr. Lee that she experienced two to three episodes of syncope per week. (*Id.*). Plaintiff returned to Dr. Lee on March 1, 2011, to discuss receiving a loop recorder device implant designed to see if her symptoms correlated with a specific arrhythmic cause, or to "perhaps [] rul[e] out the possibility of a cardiac arrhythmias as a cause of her symptoms." (*Id.*, Tr. 597, 602 PAGEID #: 674, 679). Plaintiff underwent successful placement of a Medtronic implantable loop recorder on March 18, 2011. (*Id.*, Tr. 597, PAGEID #: 674).

At a follow-up appointment on April 26, 2011, Dr. Lee noted that although there had been no significant arrhythmic events detected via the loop recorder, Plaintiff reported

2

experiencing episodes of syncope about once a week. (*Id.*, Tr. 578, PAGEID #: 655). Dr. Lee's treatment notes indicate that during an interrogation of the implantable loop recorder on July 15, 2011, the episode log showed 10 patient-activated episodes for dizziness and 90 stored VT episodes of supraventricular tachycardia. (*Id.*, Tr. 570, PAGEID #: 647). However, Plaintiff denied any "dizziness, lightheadedness or syncope with these episodes." (*Id.*).

On September 29, 2011, Plaintiff's primary care physician, Dr. Charles Vonder Embse completed a form for the Division of Disability Determination based on Plaintiff's claim of disability due to vertigo. (*Id.*, Tr. 554–55, PAGEID #: 631–32). Dr. Vonder Embse stated that Plaintiff started having blackouts in 2007 after childbirth and she cannot stand for any length of time. (*Id.*, Tr. 555, PAGEID #: 632). Dr. Vonder Embse further opined that "<u>nothing</u> makes [Plaintiff's] vertigo get better" and "she cannot maintain any kind of work." (*Id.*, Tr. 556, PAGEID #: 633).

Plaintiff saw Dr. Lee again on February 17, 2012, at which time she reported lightheadedness and "rare episodes of syncope." (*Id.*, Tr. 568, PAGEID #: 645). During the interrogation of the loop recorder on the same date, Dr. Lee noted eleven episodes of rapid heartbeats, varying in duration from seconds to several hours. (*Id.*). This, according to Dr. Lee, was consistent with paroxysmal atrial tachycardia. (*Id.*).

On June 12, 2012, Dr. Vonder Embse completed a Residual Functional Capacity ("RFC") Questionnaire in which he stated that Plaintiff could not stand/walk for any amount of time due to her vertigo, could sit only sixty minutes at one time, and could work only three hours total in a work day. (*Id.*, Tr. 614, PAGEID #: 691). Ultimately, Dr. Vonder Embse opined that Plaintiff could not work, as she could not walk without assistance, her vertigo and imbalance would be a

liability to any employer, and she has the possibility of blackouts. (*Id.*, Tr. 615, PAGEID #: 692). Several months later, in a letter dated December 3, 2012 to the Knox County Jobs and Family Services, Dr. Vonder Embse stated that Plaintiff is unable to do any type of work "due to her neurological condition," but did not mention a heart arrhythmia. (*Id.*, Tr. 645, PAGEID #: 722).

Dr. Lee's notes from January 18, 2012 state that Plaintiff had 5 symptom-stored episodes and Plaintiff reported that she experienced syncopal episodes lasting ten to fifteen minutes in duration. (*Id.*, Tr. 717, PAGEID #: 794). The notes do not state whether the syncopal episodes were congruent with any recorded arrhythmias. The loop recorder was evaluated again on May 29, 2012, but this time by Dr. Kevin Hackett. (*Id.*, Tr. 702, PAGEID #: 779). There were 105 episodes in the VT counters, and Dr. Hackett stated that Plaintiff reported lightheaded episodes and syncope two times since the device was last checked. (*Id.*). Although Plaintiff claimed she used her activator for both of the syncopal episodes, there were no patient-activated events recorded. (*Id.*). Accordingly, Dr. Hackett reviewed with Plaintiff the correct way to use the activator. (*Id.*). Dr. Hackett reviewed the device on August 29, 2012, as well, and the episode log revealed 108 VT episodes. (*Id.*, Tr. 681, PAGEID #: 758). Plaintiff reported occasional dizziness and lightheadedness, but stated that she lost her activator so she was unable to mark these alleged episodes. (*Id.*). Accordingly, it is unclear if the lightheadedness was simultaneous with any episodes.

On May 2, 2012, Plaintiff saw Dr. Charles W. Longwell, III, at the Mount Carmel East Neurology Clinic for her daily vertigo and dizziness. (Doc. 9-8, Tr. 886, PAGEID #: 964). Plaintiff reported to Dr. Longwell that she had noticed her heart beating rapidly during some of

4

the dizziness episodes, but that she also believes she has the rapid heartbeat without having dizziness. (*Id.*). Dr. Longwell also noted that Plaintiff has a history of syncope, "but that does not seem to have been happening as much lately." (*Id.*, Tr. 887, PAGEID #: 965). Ultimately, Dr. Longwell concluded that because Plaintiff has "an obvious cardiac abnormality that could very well cause her symptoms," he decided to postpone neurological treatment to see if cardiac treatment was successful. (*Id.*, Tr. 888, PAGEID #: 966). Plaintiff saw Dr. Longwell again on October 1, 2012, at which time it was noted that Plaintiff continued to have dizziness episodes that were described as "more of a lightheadedness with an occasional mild spinning sensation." (*Id.*, Tr. 882, PAGEID #: 960). Plaintiff was described as having "actually lost consciousness with some of these falls." (*Id.*). Dr. Longwell ordered an MRI of the brain and strongly recommended that she see her cardiologist. (*Id.*, Tr. 883, PAGEID #: 961).

At an appointment with her cardiologist, Dr. Lee, on December 7, 2012, Plaintiff reported palpitations about once or twice a day that at times were associated with lightheadedness. (Doc. 9-7, Tr. 642, PAGEID #: 719). Dr. Lee noted that interrogation of the loop recorder had revealed recurrent episodes of supraventricual tachycardia. (*Id.*). Although Plaintiff once again did not use her activator, she stated that she becomes dizzy and feels like the "room is spinning" when the episodes occur. (*Id.*, Tr. 641, PAGEID #: 718). At that same appointment, Plaintiff elected to proceed with a cardiac electrophysiologic study and curative ablation of her cardiac arrhythmia. (*Id.*, Tr. 642, PAGEID #: 719). Plaintiff underwent the curative ablation on December 20, 2012, but the arrhythmia could not be terminated. (*Id.*, Tr. 634, 639–40, PAGEID #: 711, 716–17). Because the ablation was unsuccessful, Dr. Lee prescribed propafenone instead. (*Id.*, Tr. 640, PAGEID #: 716). At a March 29, 2013 appointment, Plaintiff reported

that while on propafenone, her palpitations worsened, but there was no mention of syncope or how the medication affected the alleged syncope. (Doc. 9-8, Tr. 894, PAGEID #: 972).

On April 23, 2013, Dr. Vonder Embse completed a second RFC Questionnaire in which he stated Plaintiff's prognosis was "poor," and she could not stand for any amount of time and could only sit for five minutes at a time. (*Id.*, Tr. 898, PAGEID #: 976). Dr. Vonder Embse stated Plaintiff would be absent more than four times a month due to her impairment, and was not physically capable of working. (*Id.*, Tr. 899, PAGEID #: 977).

Dr. Lee evaluated the loop recorder again on May 6, 2013, which indicated 201 VT episodes. (Doc. 9-10, Tr. 914, PAGEID #: 966). Plaintiff stated she had occasional lightheadedness, although she did not use her activator, and no mention was made of syncope. (*Id.*). The next month, Dr. Lee completed an identical RFC questionnaire to the one Dr. Vonder Embse completed, and stated Plaintiff's prognosis was "fair," that she could stand for fifteen minutes at a time, and could sit for sixty minutes at a time, but could sit for eight hours in a workday. (*Id.*, Tr. 908, PAGEID #: 987). Dr. Lee also opined that Plaintiff would be absent three to four times per month, but was not physically capable of working an eight hour, five days a week job. (*Id.*, Tr. 909, PAGEID #: 988). Three days later, on June 28, 2013, Dr. Lee completed a form in which he checked a box indicating "4.05 Recurrent Arrhythmias" were "present," although no explanation was given. (*Id.*, Tr. 911, PAGEID #: 990). Plaintiff's loop recorder was explanted in September 2013. (*Id.*, Tr. 921, PAGEID #: 1000).

Plaintiff did not seek treatment for almost two years. Then, on April 7, 2015, Plaintiff saw Nurse Practitioner Tim Nuss for what was described as "as overdue cardiovascular visit." (*Id.*, Tr. 923, PAGEID #: 1002). Plaintiff reported that three weeks prior to her appointment she

experienced an episode of tachypalpitations and light-headedness, but despite this episode, she claimed she had no prior episodes since her last visit with Dr. Lee in 2013. (*Id.*). Plaintiff also denied any near syncope or syncopal events. (*Id.*). At a follow-up appointment with Mr. Nuss just one month later, Plaintiff described experiencing palpitations, dizziness, lightheadedness, and chest pain. (*Id.*, Tr. 921, PAGEID #: 1000). However, Plaintiff's most pressing concern was "persistent sternal pain." (*Id.*). There was no mention of syncope and Plaintiff was described as "relatively asymptomatic to any tachypalpitations." (*Id.*, Tr. 922, PAGEID #: 1001).

Dr. Vonder Embse completed a "Physical Assessment" for Plaintiff on April 19, 2015. (*Id.*, Tr. 941, PAGEID #: 1020). Despite his extreme restrictions in the past, Dr. Vonder Embse opined that Plaintiff could sit for six hours in a workday and could stand/walk for four hours, although he stated she would need approximately four fifteen-minute breaks per day. (*Id.*). He also opined that Plaintiff would be absent once or twice per month. (*Id.*, Tr. 941–42, PAGEID #: 1020–21).

On September 22, 2015, Plaintiff saw cardiologist Dr. Joshua Silverstein, with chief complaints of dizziness and syncope. (*Id.*, Tr. 930, PAGEID #: 100). Specifically, Plaintiff reported that "she continues to have daily episodes of palpitations that are associated with lightheadedness and near syncope. She also states that she passes out several times a day." (*Id.*, Tr. 931, PAGEID #: 1010). Dr. Silverstein noted Plaintiff's history of atrial tachycardia, but stated that he "was not convinced that all of [] [Plaintiff's] symptoms are attributable to her SVT, especially her reported syncopal events." (*Id.*, Tr. 932, PAGEID #: 1011). As a result, Dr. Silverstein ordered a one week event recorder "to try to correlate symptoms with arrhythmia."

7

(*Id.*). There is no evidence in the record that Plaintiff followed-up to receive an event recorder.

### C. Relevant Testimony at the Administrative Hearing

On July 30, 2015, the ALJ held a supplemental hearing following the Appeals Council's remand. (Doc. 9-2, Tr. 96, PAGEID #: 168). Due to a lack of new evidence, however, the ALJ continued the hearing until Plaintiff could attend an upcoming exam with her cardiologist, Dr. Silverstein. (*Id.*, Tr. 104–06, PAGEID #: 176–78).

At the reconvened hearing on June 17, 2106, Plaintiff's counsel began by arguing that Dr. Lee's records support a finding that Plaintiff meets Listing 4.05. (*Id.*, Tr. 61, PAGEID #: 133). Plaintiff testified that she gets dizzy three to four times a day, has blackouts two to three times per week, and suffers from constant chest pain where her loop recorder was implanted. (*Id.*, Tr. 65, PAGEID #: 137). These episodes, according to Plaintiff, began when she was pregnant in 2007 and have worsened over time. (*Id.*, Tr. 71, PAGEID #: 143). When asked by the ALJ if her symptoms ever improved, Plaintiff replied "no." (*Id.*). Despite her symptoms, Plaintiff said she is not on any medication, nor is she involved in any treatment. (*Id.*, Tr. 67, PAGEID #: 139). In terms of daily living, Plaintiff testified that she cannot do chores around the house and does not do any outside work, but can shower and go to the grocery story if others are around. (*Id.*, Tr. 68–69, PAGEID #: 140–41). She also stated that she maintains her own finances, can fix her son simple meals, attends parent/teacher meetings, reads, watches TV, plays board games, and is able to use her smartphone for Facebook and email. (*Id.*, Tr. 69–70, PAGEID #: 141–42).

Dr. Keith Holan also testified as a medical expert via telephone. (*Id.*, Tr. 74, PAGEID #: 146). Although Dr. Holan never personally examined Plaintiff, he reviewed her medical records prior to the hearing and listened to her testimony. (*Id.*). Dr. Holan testified that he considered

Listing 4.05 but believed the presence of a cardiac syncope or near syncope was not clearly documented in the record. (*Id.*, Tr. 75, PAGEID #: 147). Dr. Holan clarified that it was not his opinion that Plaintiff does not have an arrhythmia but instead that she "has not been having prescribed treatment for the length of time that 4.05 requires." (*Id.*, Tr. 78, PAGEID #: 150). Further, he explained that dizziness and blackout spells would be consistent with the underlying condition, but it was "somewhat confusing that she wasn't having the problem in April of 2015," but then was allegedly having the issues daily in September 2015. (*Id.*). Indeed, Dr. Holan noted that Tim Nuss, CNP reported that Plaintiff had no current history of syncope on April 7, 2015, but then Plaintiff told Dr. Silverstein on September 22, 2015, that she experienced daily syncopal episodes. (*Id.*, Tr. 76, PAGEID #: 148).

Upon cross examination, Dr. Holan testified that he thought Plaintiff "may have met listings in 2013, when she was seeing Dr. Lee, and her loop recorder log showed 200 tachycardia episodes." (*Id.*, Tr. 81, PAGEID #: 153). However, Dr. Holan explained that the amount of her treatment at that time was unclear. (*Id.*). Further, Dr. Holan acknowledged that Plaintiff complained of syncopal episodes during the time she had her loop recorder; however, nothing in the medical record suggested that "anyone witnessed any of these syncopal episodes." (*Id.*, Tr. 85–86, PAGEID #: 157–58). In other words, Dr. Holan opined that syncopal symptoms would not be unexpected with an arrhythmia, but no documentation supported the allegations because "the complete loss of consciousness would have to be documented by actually being witnessed." (*Id.*, Tr. 86, PAGEID #: 158).

### D. The ALJ's Decision

The ALJ found that Plaintiff suffered the following severe impairments: vertigo and

syncope, paroxysmal atrial tachycardia, status post ablation of the right atrium, degenerative disc disease of the lumbar spine, and obesity. (Doc. 9-2, Tr. 27, PAGEID #: 99). Despite these impairments, the ALJ held that Plaintiff did not have an impairment or combination of impairments that met or equaled a listing. (*Id*., Tr. 29, PAGEID #: 101). Specifically, the ALJ noted that Plaintiff did not meet Listing 4.05 for recurrent arrhythmias, in part, because "the record did not clearly document cardiac syncope or near syncope" and Plaintiff had not undergo the prescribed treatment required by the Listing. (*Id.*). The ALJ also noted that Plaintiff's alleged symptoms regarding her syncope were inconsistent with her reports to her treating doctors—reports that indicated both improvement in her symptoms with treatment and large gaps in treatment. (*Id.*).

As to Plaintiff's RFC, the ALJ stated:

[T]he claimant has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently. She can sit for six of eight hours and stand and walk for two of eight hours. The claimant can engage in the occasional climbing of ramps or stairs but no climbing of ladders, ropes, or scaffolds. She can occasionally balance, stoop, kneel, crouch, or crawl, and can have frequent exposure to extremes of temperature (cold and hot) and humidity. She cannot work around hazards such as unprotected heights and dangerous machinery.

(*Id.*, Tr. 30, PAGEID #: 102). In reaching this conclusion, the ALJ gave "significant weight" to the testimony of the medical expert who had opined on an identical RFC, in part, because of his knowledge of the Social security Administration's program and requirements, and because his opinion was "based on a greater longitudinal perspective of the claimant's condition." (*Id.*, Tr. 31, PAGEID #: 103).

Additionally, the ALJ explained that although Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," Plaintiff's

"statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record[.]" (*Id.*, Tr. 30–31, PAGEID #: 102–03). For example, the ALJ noted that, although Plaintiff complained of dizziness and lightheadedness throughout 2012 and 2013, she was unable to mark these episodes because she either failed to use her activator or reported losing her activator. (*Id.*, Tr. 32, PAGEID #: 104). Further, the ALJ discussed that Plaintiff stopped her cardiology follow-ups for nearly two years, and when she resumed treatment in April 2015, she denied any near syncope or syncopal events. (*Id.*). However, in September 2015, she alleged syncope and stated she passed out several times a day. (*Id.*). Accordingly, the ALJ opined that Plaintiff's alleged frequency of her syncopal events were "contradicted by her own reports to her treating doctors revealing far less frequency" and her "lack of further follow-up with cardiology [was] suggestive of tolerable symptomology." (*Id.*, Tr. 33, PAGEID #: 105).

With this in mind, the ALJ assigned "little weight" to Dr. Lee's opinion, in part, because he "did not have the benefit of [witnessing] [the claimant's apparent improvement in symptomology with no further cardiology visits for nearly two years after he last saw the claimant." (*Id.*, Tr. 35, PAGEID #: 107). No weight was given to his opinion that Plaintiff's impairments met Listing 4.05, because no explanation was given and there was no objective evidence to support the criteria of the Listing. (*Id.*).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g).

"[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). "Therefore, if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

## III. DISCUSSION

Plaintiff asserts three assignments of errors: (1) that the ALJ improperly evaluated Listing 4.05, (2) the ALJ's RFC finding was the product of legal error and was unsupported by substantial evidence, and (3) the ALJ's adverse credibility determination was not supported by substantial evidence. (Doc. 11).

### A. Listing 4.05

Plaintiff argues that "[t]he ALJ failed to analyze Listing 4.05 which was harmful error as the evidence shows Plaintiff likely meets the Listing." (Doc. 11 at 2). More specifically, Plaintiff states that the ALJ failed to conduct the appropriate analysis of Listing 4.05 after the Dr. Holan's testimony. (*Id.*). At the time of the ALJ's decision, Listing 4.05 provided:

> 4.05 Recurrent arrhythmias, not related to reversible causes, such as electrolyte abnormalities or digitalis glycoside or antiarrhythmic drug toxicity, resulting in uncontrolled (see 4.00A3f), recurrent (see 4.00A3c) episodes of cardiac syncope or near syncope (see 4.00F3b), despite prescribed treatment (see 4.00B3 if there is no prescribed treatment), and documented by resting or ambulatory (Holter) electrocardiography, or by other appropriate medically acceptable testing, coincident with the occurrence of syncope or near syncope (see 4.00F3c).

20 C.F.R. Pt. 404, Subpart P, Appendix 1, Listing § 4.05. [1] "The definition section of the listing includes tachycardia as an arrhythmia." *Linderman*, 2017 WL 2304281, at *9 (citing 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 4.00(F)(1)). As discussed above, the ALJ found that Plaintiff did suffer from paroxysmal atrial tachycardia, but that there wasn't evidence of recurrent episodes of cardiac syncope despite prescribed treatment. (Doc. 9-2, Tr. 27, PAGEID #: 99).

It is well established that to be found disabled based upon a listed impairment, "the claimant must exhibit all the elements of the listing." *Robertson v. Comm'r of Soc. Sec.*, 513 F. App'x 439, 440 (6th Cir. 2013) (quoting *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F. 3d 124, 125 (6th Cir. 2003)). It is not enough that a claimant comes close to meeting the requirements of a listed impairment. *Id.* As the Sixth Circuit has explained,

> [t]he requirements of section 4.05 are met where a claimant has a recurrent arrhythmia that is not fully controlled and that results in uncontrolled recurrent episodes of syncope or near syncope, and there is a documented association between the recurrent arrhythmia and the syncope or near syncope. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 4.00F(3)(a), (c), 4.05. "Syncope" is defined as "a loss of consciousness or a faint," while "near syncope" is defined as "a period of altered consciousness." 20 C.F.R. pt. 404, subpt. P, app. 1, § 4.00F(3)(b).

*Id.* at 440–41. Merely feeling lightheaded or dizzy does not amount to near syncope. *See Linderman*, 2017 WL 2304281, at *9.

Here, the ALJ fully analyzed Listing 4.05, and substantial evidence supports his determination that Plaintiff did not meet the Listing. Listing 4.05 requires evidence of syncope or near syncope "coincident with" the tachycardia. *See Linderman*, 2017 WL 2304281, at *9.

---

[1] "Federal courts will review the Commissioner's final decisions using the rule that was in effect at the time we issued the decision." *Linderman v. Comm'r of Soc. Sec.*, No. 1:16-CV-944, 2017 WL 2304281, at *9 (N.D. Ohio Apr. 6, 2017) (citing https://www.federalregister.gov/documents/2016/07/01/2016-15306/revised-medical-criteria-for-evaluating-neurological-disorders).

As the ALJ explained, Plaintiff did not provide any such evidence, as she did not comply with prescribed treatment or utilize her activator, which could have demonstrated that her alleged syncope coincided with her arrhythmia episodes. Also important, Plaintiff's own reports to her doctors contradict an association between her arrhythmia and alleged episodes of syncope. (*See, e.g.*, Doc. 9-7, Tr. 570, PAGEID #: 647 (although plaintiff had 90 stored VT episodes of supraventricular tachycardia, she denied any syncope with these episodes); Doc. 9-8, Tr. 886, PAGEID #: 964 (Plaintiff reported to Dr. Longwell that she believed she has rapid heartbeat without having dizziness)). The ALJ also noted that the most recent cardiologist to examine Plaintiff, Dr. Silverstein, opined that he "was not convinced that all of [] [Plaintiff's] symptoms [were] attributable to her SVT, especially her reported syncopal events." (Doc. 9-9, Tr. 932, PAGEID #: 1011). And when Dr. Silverstein ordered a one week event recorder "to try to correlate symptoms with arrhythmia," Plaintiff failed to follow up.

Thus, Plaintiff does not raise a substantial question whether she meets Listing 4.05 because she fails to show that she experienced syncope or near syncope in conjunction with an arrhythmia episode. *Linderman*, 2017 WL 2304281, at \*10 (citing *O'Connor v. Astrue*, No. CIV.A. 10–0093 DMC, 2011 WL 1321674, at \*12–13 (D.N.J. Mar. 30, 2011), *aff'd sub nom. O'Connor v. Comm'r Soc. Sec.*, 466 F. App'x 96 (3d Cir. 2012) ("[B]ecause Plaintiff failed to show that his impairments satisfied all of the required criteria under the Listing 4.05 (specifically, that he experienced syncope or near syncope in conjunction with his arrhythmia episodes), there is substantial evidence to support ALJ Andres's conclusion that Plaintiff did not meet or equal . . . Listing 4.05.")).

Finally, Plaintiff's argument that the ALJ's opinion was "internally inconsistent"—because he found that Plaintiff had the severe impairment of syncope, yet relied on Dr. Holan's testimony that the record did not contain evidence of Plaintiff's syncope—is without merit. As the Commissioner correctly notes, whether Plaintiff suffered severe impairments at Step Two is a considered a "*de minimis* hurdle," *see Singleton v. Comm'r of Soc. Sec.*, 137 F. Supp. 3d 1028, 1033 (S.D. Ohio 2015), whereas at Step Three, Plaintiff carries the burden of showing that, based on medical evidence, her impairments met or were equal to a specific listed impairment. *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 365 (6th Cir. 2014) (citing § 404.1520(a)(4)(iii)). As explained, Plaintiff failed to meet that burden, and substantial evidence supports the ALJ's decision at Step Three. *See Stafford v. Comm'r of Soc. Sec.*, No. 0:16-CV-00095-KKC, 2017 WL 4287198, at *3 (E.D. Ky. Sept. 27, 2017).

### B. RFC Finding

Although in her second assignment of error Plaintiff states she is challenging whether substantial evidence supports her RFC, her argument actually involves the treating physician rule. Indeed, Plaintiff states that "the RFC is unsupported by substantial evidence because the ALJ improperly accorded limited weight to the opinion of Plaintiff's treating physician, Dr. Lee," in violation of Sixth Circuit precedent. (Doc. 11 at 5–7). Plaintiff also argues the ALJ failed to weigh properly Dr. Lee's opinions and failed to "provide the requisite 'good reason' for discounting it." (*Id.* at 7).

Two related rules govern how an ALJ is required to analyze a treating physician's opinion. *Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016). The first is the "treating physician rule." *Id.* The rule requires an ALJ to "give

controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted). Closely associated is "the good reasons rule," which requires an ALJ always to give "good reasons . . . for the weight given to the claimant's treating source opinion." *Dixon*, 2016 WL 860695, at *4 (quoting *Blakely*, 581 F.3d at 406 (alterations in original)); 20 C.F.R. § 404.1527(c)(2). The treating physician rule and the good reasons rule together create what has been referred to as the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013).

Here, the ALJ declined to give controlling weight to Dr. Lee, stating that his opinion was "inconsistent with the medical evidence of record" and did not account for Plaintiff's apparent improvement in symptomology without any cardiology visits for nearly two years. (Doc. 9-2, Tr. 35, PAGEID #: 107). Moreover, the ALJ noted that Dr. Lee's decision to check a box on a preprinted form in 2013, was accompanied by no explanation, and again, was not supported by objective evidence. (*Id.*). Instead, the ALJ chose to rely heavily on Dr. Harmon's opinion that Plaintiff did not meet Listing 4.05, based upon the reasons previously explained—that he had a broader longitudinal picture of Plaintiff's symptoms and had knowledge of the Social Security Administration's program and requirements.

Although Plaintiff may disagree with the ALJ's ultimate conclusion, his decision to reject Dr. Lee's opinion was appropriate because the ALJ found it was inconsistent with the other

evidence in the record and was not supported by objective evidence—namely, that an arrhythmia coincided with syncope or near syncope. Further, the ALJ's explanation constitutes sufficient detail to satisfy the good-reasons requirement and appropriately explained the disposition of the case to Plaintiff. *See Barncord v. Comm'r of Soc. Sec.*, No. 2:16-CV-389, 2017 WL 2821705, at *6 (S.D. Ohio June 30, 2017). Thus, the ALJ followed the two-step analysis created by the Sixth Circuit, as his findings and reasoning regarding Dr. Lee's opinion were supported by substantial evidence. It was therefore not an error for the ALJ to assign Dr. Lee's opinion little to no weight, and his decision to do so does not undermine Plaintiff's RFC. *See id.*

### C. Credibility Determination

In her final assignment of error, Plaintiff argues that the ALJ erroneously relied on her gap in treatment and failure to seek additional treatment to "discredit" her. (Doc. 11 at 30). Plaintiff states that her discontinued treatment, instead, was a reasonable decision after numerous years and treatments made her condition worse. (*Id.* at 29–30).

An ALJ's credibility determinations about a claimant are to be given great weight. However, they must also be supported by substantial evidence. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531 (citing *Bradley v. Sec'y of Health & Human Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1988)). However, under SSR 16-3p, which was effective on March 28, 2016, an ALJ must focus on the consistency of an individual's statements about the intensity, persistence and limiting effects of symptoms, rather than credibility. *Compare* SSR 96-7p, 1996 SSR LEXIS 4, *with* SSR 16-3p, 2016 SSR LEXIS 4. While courts have disagreed as to whether

the regulation applies retroactively, the Court need not resolve the issue because under either lens—credibility or consistency—the Court finds that the ALJ analyzed the record appropriately. *See Barncord v. Comm'r of Soc. Sec.*, No. 2:16-cv-389, 2017 WL 2821705, at *10–12. (S.D. Ohio June 30, 2017) (affirming recommendation that the Court need not resolve the retroactivity issue).

The ALJ noted here that Plaintiff's allegations regarding the persistence of her syncope or near syncope "was not entirely consistent." (Doc. 9-2, Tr. 31, PAGEID #: 103). For example, he noted that Plaintiff reported only occasional lightheadedness and *rare* episodes of syncope to Dr. Lee in February 2012, but just two months later, she reported experiencing syncope weekly. (*Id.*). When asked by the ALJ if her symptoms had ever improved, she replied "no," despite telling Mr. Nuss in 2015 that she had been essentially symptom-free for nearly two years. Further, Plaintiff's primary care physician Dr. Vonder Embse's RFC reports suggest Plaintiff was greatly improving. (*Compare* Doc. 9-8, Tr. 898, PAGEID #: 976 (In April 2013, Dr. Vonder Embse stated Plaintiff could not stand for any amount of time and could sit for only five minutes at a time) *with* Doc. 9-9, Tr. 941, PAGEID #: 1020 (Dr. Vonder Embse opined in April 2015 that Plaintiff could sit for six hours and stand/walk for four hours)).

The ALJ also relied on various inconsistencies in Plaintiff's described limitations to her physicians, such as her representation in September 2011 that she could not stand for more than five minutes; yet, a month later she reported caring for her school age son, spending time socializing with family members, and playing board games. (*Id.*, Tr. 32, PAGEID #: 104). Finally, the ALJ noted multiple times that Plaintiff failed to continue treatment or seek additional treatment for long periods of times and failed to follow her doctors' orders in utilizing her

activator, making her allegations of disabling symptomology less credible.

Based upon the foregoing, the Court finds that the ALJ's assessment of Plaintiff's credibility and consistency was based on consideration of the entire record and is supported by substantial evidence.

## IV. CONCLUSION

For the reasons stated, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 11) be **OVERRULED** and that judgment be entered in favor of Defendant.

### Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1). Failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140, 152–53 (1985).

IT IS SO ORDERED.

Date: November 28, 2017	/s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE